UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE

TWB DISTRIBUTION, LLC and
KALOLOGIE SKINCARE, LLC                                                    PLAINTIFFS

v.                                                              CIVIL ACTION NO. 3:08-CV-509-S

BBL, INC., ET AL.                                                          DEFENDANTS

### MEMORANDUM OPINION

This matter is before the Court on defendants' Fed. R. Civ. P. 12(b)(6) motion to dismiss for failure to state a claim on which relief can be granted. For the reasons that follow, the Court will grant that motion in full.

### BACKGROUND

This case arises out of a business relationship between participants in the high-end cosmetics industry. Defendant BBL, Inc.[1] manufactures "ReVive" brand skin-care products. In 2005, it began selling these products to boutique retailer Kalologie, LLC for distribution and retail sale in the southwestern United States. No written agreement exists governing the BBL-Kalologie relationship; each sale was discrete and governed by a separate purchase order.

After some success in selling ReVive products through Kalologie in the United States, BBL contracted with plaintiff TWB Distribution, LLC, an affiliate of Kalologie, to be its exclusive distributor in Japan. This arrangement was memorialized in a written Distribution Agreement, signed May 1, 2006 and extending through May 31, 2009. TWB succeeded in gaining entry for ReVive in the Japanese market, where it was sold by the prominent department store Isetan.

---

[1] Defendant Gurwitch Products, LLC purchased BBL in May 2008. Both corporations are defendants in this action along with Gregory Brown, BBL's founder.

In early 2007, the Japanese government announced new regulations banning the use of diazolidinyl urea in cosmetic products. As BBL had commonly used this compound as an antimicrobial preservative in its ReVive products, the new regulation necessitated a change in formula if ReVive was to remain in the Japanese market. As was common practice, ReVive and Isetan were allowed an unspecified reasonable period of time to exhaust existing inventory before replacing it with goods conforming to regulations. By the end of 2007, however, BBL had failed to provide reformulated products, and Isetan was forced to remove ReVive from its shelves.

In March 2008, representatives of BBL and TWB met to discuss a re-launch of reformulated ReVive products in Japan. The parties set a target date of September 3, 2008 for the re-launch and agreed to extend the existing distribution agreement for a minimum of 24 months (through May 2011). None of these terms were reduced to writing.

Relying on its discussions with BBL, TWB (via its Japanese distributor, Appreaging Laboratories) negotiated a re-launch with Isetan, complete with prominent first-floor placement of ReVive products. TWB alleges that it expended over $1 million in preparing to bring the products back to market.

Although the original Distribution Agreement contained a provision in which BBL warranted that ReVive products did not infringe upon any trademark rights, TWB discovered in July 2008 that the Japanese trademark for the word "revive" was owned by Shuei Trading, a Japanese company. Gurwitch (which by this time owned BBL) informed TWB that it would contact Shuei to resolve the trademark issue.

On July 28, 2008, Gurwitch announced to TWB that it would need to delay the re-launch due to the trademark question and a problem with a raw ingredient in the reformulated ReVive products.

After TWB applied some pressure, however, Gurwitch managed to resolve these issues in time for the launch to proceed as planned on September 3.

But problems persisted. Isetan requested the presence of BBL's founder Gregory Brown to aid in the promotion of the ReVive line. Plaintiffs had originally agreed to do business with Brown and his companies based in part on their belief that he was a licensed physician. They thereafter learned that while Brown had formerly been a licensed plastic surgeon, he had surrendered his license in 2004. With this knowledge, TWB felt that it could not send Brown to Japan, as Isetan was under the impression that BBL's products were backed by a licensed physician.

Further, the bottles in one of the initial shipments of ReVive products contained an unidentified sediment. Isetan refused to sell such products, and TWB contacted Gurwitch to demand conforming goods. After some delay, Gurwitch sent Isetan a letter stating that the sediment was normal. Isetan was unsatisfied. Between the sediment and Gurwitch's inability to provide a licensed physician, it had had enough. Isetan terminated its business relationship with TWB and ceased selling ReVive products in Japan.

On December 12, 2008, Gurwitch advised TWB that it was terminating the Distribution Agreement, effective immediately. It refused to honor the unwritten two-year extension that TWB felt had been in place. Simultaneously, Gurwitch ceased selling its products domestically to Kalologie.

Kalologie and TWB filed this diversity action, which contains four counts. Count I alleges that Gurwitch breached its contractual obligations relating to distribution of ReVive products in Japan. Count II asserts a promissory estoppel claim, also relating to the Japanese distribution of ReVive products. In Count III, Kalologie seeks to recover for breach of an alleged contract to

distribute ReVive products in the United States. Finally, Count IV claims that Brown fraudulently induced Kalologie and TWB to contract with BBL by falsely claiming to be a licensed physician.

Defendants have moved to dismiss Count I in part, and Counts II, III, and IV in their entirety.

## ANALYSIS

Under Fed. R. Civ. P. 12(b)(6), the Court may grant a motion to dismiss for failure to state a claim when the complaint fails to plead enough facts to demonstrate the plausibility of the claim. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 127 S.Ct. 1955 (2007). The court must accept the allegations of the Amended Complaint as true, and draw all reasonable inferences in plaintiffs' favor. *DirectTV, Inc. v. Treesh*, 487 F.3d 471, 476 (6th Cir. 2007). The Federal Rules "require[] only 'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Twombly*, 550 U.S. at 555, 127 S.Ct. at 1964 (*quoting Conley v. Gibson*, 355 U.S. 41, 47, 78 S. Ct. 99, 2 L. Ed. 2d 80 (1957)) "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* at 555, 127 S.Ct. at 1964-65. *Twombly* "do[es] not require heightened fact pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face." *Id.* at 570, 127 S.Ct. at 1974.

Sitting in diversity, the Court will apply Kentucky law to resolve the questions at hand. *Shropshire v. Laidlaw Transit, Inc.*, 550 F.3d 570, 573 (6th Cir. 2008) *(citing Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78, 58 S. Ct. 817, 82 L. Ed. 1188 (1938)).

I.

Defendants have moved to dismiss plaintiffs' claim for breach of the two-year contract extension allegedly negotiated as part of the Japanese re-launch of ReVive,[2] arguing that any such oral agreement is unenforceable.

As the alleged agreement was to be an extension or renewal of the Distribution Agreement that was originally signed in May 2006, the Court will look to that instrument to determine the governing law. Although on its face the Distribution Agreement appears to be one for services (i.e. the distribution of goods, rather than the contemplated purchase and sale thereof), Kentucky law is settled that the U.C.C. governs such an agreement. *Peters Wholesale Furniture, Inc. v. Manchester Furniture Group*, 2005 U.S. Dist. LEXIS 21583 (W.D. Ky. Sept. 26, 2005) (furniture wholesaling agreement treated as a contract for the sale of goods); *Pharo Distributing Co. v. Stahl*, 782 S.W.2d 635 (Ky. Ct. App. 1989) (franchise agreement to distribute alcohol in certain counties was a contract for sale of goods under the U.C.C. as adopted by Kentucky); *Leibel v. Raynor Mfg. Co.*, 571 S.W.2d 640 (Ky. Ct. App. 1978) (oral agreement under which a party was to have an exclusive dealer/distributorship for vendor's garage doors in a certain territory was a contract for sale of goods under the U.C.C.).

The agreement plaintiffs seek to enforce here might be characterized either as a brand-new contract under the same terms as the previous one, or as a modification of the written contract's duration term. Plaintiffs, in fact, refuse to distinguish the two, alternating in their briefs between "renewal" (i.e. creation of a new contract) and "extension" (i.e. modification of the contract's length). But notwithstanding plaintiffs' declaration that "there is no need for a distinction" (Resp.

---

[2] Plaintiffs have also stated various other breach-of-contract claims, the sufficiency of which is not challenged here.

21), it is in fact the case that the U.C.C. treats new contracts and modifications to existing contracts differently. Because there is no writing, however, we must consider the facts and circumstances surrounding the alleged oral agreement to determine how the it should be treated.

The only change worked by the oral agreement was an increase in the duration term of the original contract. All other aspects of the written agreement were (we suppose) to remain in place. This suggests that the oral agreement was a modification of the original: One would expect a new agreement to contain other changed terms, especially given the difficulties that had already arisen. Furthermore, the discussions during which this agreement was reached took place during the performance of the original written agreement. Had the discussions and agreement taken place after the expiration of the original, there would be a clear sign that a new contract was intended. As it stands, these events are more suggestive of a modification of the existing terms. Plaintiffs offer no reason to think that the agreement they seek to enforce was a novation rather than merely an extension of the original contract. Because the facts we do have point towards modification rather than renewal, the Court will treat the agreement as such.

Because the alleged agreement was a modification, it is governed by KRS 355.2-209. That section of the Code provides, in part: "A signed agreement which excludes modification or rescission except by a signed writing cannot be otherwise modified or rescinded . . . ." KRS 355.2-209(2). The Distribution Agreement falls under this section. It contains two provisions requiring a signed writing for modification: First, it states that "No amendment, change, modification or alteration of the terms and conditions hereof shall be binding on Distributor or Supplier unless in writing and signed by a duly authorized official of both parties." (Def.'s Ex. B, Distribution Agreement 10.) It goes on to state that "This agreement may be modified or amended from time to

time, but only by a written instrument signed by a duly authorized representative of each party." (*Id.* at 11.) Given KRS 355.2-209(2), it is inescapable that these provisions bar modification of the contract orally or through conduct. It is of no import that the Agreement does not specifically mention that an extension is required to be in writing, because it quite plainly bars *any* modification not in writing. Kentucky law will give effect to the contract's terms.

Plaintiffs' only hope for enforcing the oral agreement is KRS 355.2-209(4), which provides that "an attempt at modification or rescission [that] does not satisfy the [writing] requirements . . . can operate as a waiver." While the U.C.C. does not define waiver, "its meaning is well established under Kentucky law." *Marley Cooling Tower Co. v. Caldwell Energy & Envtl., Inc.*, 280 F. Supp. 2d 651, 660 (W.D. Ky. 2003). "'Waiver is the intentional relinquishment of a known right,' and 'may be implied from conduct inconsistent with the assertion of that right.'" *Id.* (*quoting FS Invs., Inc. v. Asset Guar. Ins. Co.*, 196 F. Supp. 2d 491 (E.D. Ky. 2002)). However, "'waiver will not be inferred lightly.' That is to say, something more than a mere inference of intent is required." *Weis Builders, Inc. v. Complete Contr., Inc.*, 247 S.W.3d 542, 545 (Ky. Ct. App. 2008) (*quoting Conseco Fin. Serv. Corp. v. Wilder*, 47 S.W.3d 335 (Ky. App. 2001)).[3]

In deciding this motion, we must take all of plaintiffs' allegations to be true, and draw all reasonable inferences in their favor. *Treesh*, 487 F.3d at 476. Bearing this in mind, we still cannot find in plaintiffs' favor. We are asked to find that defendants waived their right to enforce the contract as written, but the allegations in the Amended Complaint are insufficient to establish an intentional relinquishment of that right. Plaintiffs claim that, at the March 2008 meeting, "BBL and

---

[3] Courts disagree as to whether a plaintiff must show detrimental reliance in addition to waiver. *See Marley*, 280 F. Supp. 2d at 660 n.6. We need not address that question here, because plaintiffs have failed to present sufficient allegations to prove the waiver itself.

Brown repeatedly agreed and represented that they would extend the existing exclusive distribution agreement for a minimum period of 24 months if TWB would proceed with the re-launch efforts." (Am. Compl. ¶ 45.) But making such representations is not inconsistent with later insisting that the parties adhere to the terms of the written contract. Indeed, avoiding enforcement of subsequent oral modifications is the whole point of including a clause requiring that changes be in writing. Apart from the alleged modification itself, the only fact that arguably runs contrary to BBL retaining its right to terminate the contract at the completion of the written term is its approval of TWB's agreement with Appreaging Laboratories, the Japanese distributor. But this cannot constitute an intentional relinquishment of its right to enforce its own contract with TWB. There is certainly no express waiver here, and an inference in that direction has scant support. The rest of defendants' actions—reformulating its products, resolving the Japanese trademark issue, providing goods for the September 2008 re-launch—are consistent with their obligations under the Distribution Agreement as written. The fact that defendants honored their preexisting contractual duties cannot weigh heavily in favor of an inference that they had waived another portion of the contract and accepted new, unwritten responsibilities.

Plaintiffs have failed to allege facts sufficient to show the existence of an enforceable two-year renewal or extension of the Distribution Agreement between TWB and BBL. The motion to dismiss plaintiffs' breach of contract claim must therefore be granted with respect to the alleged oral agreement.

## II.

Plaintiffs next assert that defendants are estopped from refusing to honor the alleged contract extension. The Kentucky Supreme Court has recently reaffirmed that promissory estoppel is "'alive and well' in this Commonwealth." *Sawyer v. Mills*, 2009 Ky. LEXIS 195, at *23 n.3 (Ky. Aug. 27, 2009) (*quoting McCarthy v. Louisville Cartage Co.*, 796 S.W.2d 10, 11 (Ky. App. 1990)). The *Sawyer* court quoted the Restatement (Second) of Contracts in defining the doctrine as follows:

> A promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise. The remedy granted for breach may be limited as justice requires.

*Id.* at *23 (*quoting* Restatement (Second) of Contracts § 90(1). *See also Meade Const. Co. v. Mansfield Commercial Elec.*, 579 S.W.2d 105, 106 (Ky.1979) (quoting the same section in draft form). In the comments, the Restatement's authors note that its language is meant to be "flexible." Restatement (Second) of Contracts § 90 cmt. b. The comment continues:

> Satisfaction of the . . . requirement [that enforcement be necessary to avoid injustice] may depend on the reasonableness of the promisee's reliance, on its definite and substantial character in relation to the remedy sought, on the formality with which the promise is made, on the extent to which the evidentiary, cautionary, deterrent and channeling functions of form are met by the commercial setting or otherwise, and on the extent to which such other policies as the enforcement of bargains and the prevention of unjust enrichment are relevant.

*Id.* The Restatement thus does not absolutely require that the promisee's reliance be reasonable, though such reasonableness is a factor in deciding whether justice requires enforcement.

Citing *Rivermont Inn, Inc. v. Bass Hotels & Resorts, Inc.*, 113 S.W.3d 636 (Ky. Ct. App. 2003), defendants insist that *reasonable* reliance is a necessary element of a promissory estoppel claim. The *Sawyer* court cited *Rivermont* without mentioning the discrepancy between its formulation of the doctrine and that found in the Restatement on which it based its own ruling. This

is perhaps unsurprising, given the fact that the reasonable reliance issue was not presented in *Sawyer*, but it leaves the law unsettled.

The Kentucky Supreme Court has twice addressed the issue of promissory estoppel, and each time has cited the Restatement definition. *See Sawyer*, 2009 Ky. LEXIS 195, at *23 n.3; *Meade*, 579 S.W.2d at 106. The Kentucky Court of Appeals did the same in *McCarthy v. Louisville Cartage Co.*, 796 S.W.2d 10, 11 (Ky. Ct. App. 1990). Federal district courts have also cited definitions not absolutely requiring reasonableness. *See*, *e.g.*, *Res-Care, Inc. v. Omega Healthcare Investors, Inc.*, 187 F. Supp. 2d 714, 718 (W.D. Ky. 2001); *Bergman v. Baptist Healthcare Sys.*, 344 F. Supp. 2d 998, 1003 (W.D. Ky. 2004); *Monumental Life Ins. Co. v. Nationwide Ret. Solutions, Inc.*, 242 F. Supp. 2d 438, 451 (W.D. Ky. 2003). The Sixth Circuit has followed suit. *See Abney v. Amgen, Inc.* 443 F.3d 540, 549 (6th Cir. 2006); *Bergman v. Baptist Healthcare Sys.*, 167 Fed. Appx. 441 (6th Cir. 2006) (unpublished).

However, none of those cases turned on or squarely addressed the question whether reasonableness is an essential element of a promissory estoppel claim. The cases that have faced that issue indicate that it is indeed an essential element. *See Rivermont*, 113 S.W.3d at 640-41; *Fletcher v. Branch Banking & Trust Corp.*, 2007 U.S. Dist. LEXIS 70300 (W.D. Ky. Sept. 21, 2007); *Butler v. Progressive Cas. Ins. Co.*, 2005 U.S. Dist. LEXIS 7494 (W.D. Ky. April 25, 2005). But none of these cases bind this Court, and all three predate the Kentucky Supreme Court's most recent statement of the law in *Sawyer*. Furthermore, *Rivermont* cites no authority in support of the proposition that reasonable reliance is required. Because the Sixth Circuit and the Kentucky Supreme Court appear to agree that the Restatement definition governs promissory estoppel claims in this state, this Court feels itself constrained to join them.

Yet even after adopting a favorable view of the law and accepting plaintiffs' allegations as true, the Court cannot find in their favor. Several facts do lend their claim plausibility: TWB alleges that at the March 2008 meeting, defendants "repeatedly agreed and represented that they would extend the existing exclusive distribution agreement for a minimum period of 24 months." (Am. Compl. ¶ 45.) Plaintiffs also claim significant reliance on this promise in their efforts to prepare for the Japanese re-launch, in which they would not have engaged without assurances of the two-year extension. Assuming (as we must) that defendants made the promises in question, they either knew or should have known that TWB would rely on them. Certainly defendants knew that TWB did in fact begin to rely on the promises when it began preparing for the re-launch, and defendants never tried to disabuse them of the idea that the oral agreement would be enforced.

However, while all these facts support the plaintiffs' position, the fact remains that courts only grant relief on promissory estoppel grounds where justice *requires* it. While reasonable reliance is not an essential element of the *prima facie* case, reasonableness warrants significant consideration in deciding whether enforcement of a promise is necessary to avoid injustice. *See* Restatement (Second) of Contracts § 90 cmt. b, *supra*. Defendants argue that the reliance alleged here is unreasonable as a matter of law. They rest this assertion primarily on *Rivermont*'s statement that "[a] party cannot reasonably rely on oral statements when it has acknowledged in writing several times that oral statements are not binding and may not be relied upon." 113 S.W.3d at 642. *Fletcher* restated this rule, asserting that where a party "has specific knowledge of a written provision contradicting a subsequent oral representation, it is unreasonable as a matter of law for that [party] to rely upon the oral representation." 2007 U.S. Dist. LEXIS 70300, at *5. This argument is persuasive. Here, plaintiffs signed a contract that specifically prohibits the kind of oral modification

that is the essence of their claim. Furthermore, as discussed above, the U.C.C. specifically provides that provisions barring unwritten modifications are to be enforced. The agreement was thus in direct contradiction with the terms of the same contract it sought to extend. Although like the *Fletcher* court we are "unwilling to say that a promissory estoppel claim can *never* proceed when confronted by a clear and contradictory writing," *id.* at *6, it was surely unreasonable to rely on an oral modification expressly barred by the very contract that it purported to modify. It was far more reasonable for the defendants to rely on the terms of the written agreement. Justice simply does not require the abrogation of those terms. Consequently, the Court will dismiss Count II of the Amended complaint.

### III.

Plaintiffs next claim that defendants breached a contract for the "successive distribution" of ReVive products in the United States. The allegation is that the parties had formed an oral contract to the effect that BBL would continue selling its products to Kalologie for an indefinite period of time, but that BBL abruptly terminated this agreement without providing the reasonable notice required by the Kentucky U.C.C., KRS § 355.2-309(3). To make their case, plaintiffs must be able to allege an enforceable contract to continue supplying ReVive products. Any such agreement would cross the $500 threshold, and would therefore be subject to the statute of frauds.

Kentucky courts interpret the writing requirement loosely. *See Lonnie Hayes & Sons Staves, Inc. v. Bourbon Cooperage Co.*, 777 S.W.2d 940, 942 (Ky.App. 1989). "All that is required is that the writing afford a basis for believing that the offered oral evidence rests on a real transaction." *Id.* A satisfactory writing must contain three elements: It must show there was a contract for the sale of goods; it must be signed or otherwise authenticated; and it must specify a quantity.

*Commonwealth Aluminum Corporation v. Stanley Metal Associates*, 186 F.Supp.2d 770, 772 (W.D.Ky. 2001).

Even given Kentucky's liberal interpretation of the statute of frauds, plaintiffs' allegations cannot meet its requirements. In support of their position they can muster only a series of written purchase orders and a chain of e-mails between the parties discussing their business relationship. Each purchase order relates to a discrete sale. While each of them proves that there was a single contract for the sale of goods, none of them (nor even the lot taken together) is capable of proving the existence of an ongoing obligation to continue selling to Kalologie. That is, there is nothing in any of them to show that BBL had agreed to continue providing its products for distribution for any set or indefinite period of time. The purchase orders prove the existence of a business relationship, to be sure, but such a relationship is not the equivalent of an enforceable contract. The proffered e-mails are also insufficient to prove such an obligation. Nothing signed by the defendants evinces an agreement to continue supplying ReVive products indefinitely.

Plaintiffs rely on this Court's decision in *Commonwealth Aluminum*, which held that a letter sent by a seller satisfied the statute of frauds. The case at bar is distinct, however, in that the writings cited here at no point acknowledge the existence of the specific contract that the plaintiffs seek to enforce. In contrast, the letter in *Commonwealth Aluminum* discussed the terms of the oral contract that had been alleged, and indeed conformed with the details of the claimed breach. The purchase orders and e-mails in this case do not show the existence of an ongoing distribution contract. Consequently, the facts and allegations of record are insufficient as a matter of law to satisfy the writing requirement of the statute of frauds. Count III of the Amended Complaint must therefore be dismissed.

**IV.**

Finally, plaintiffs seek to recover on a claim of fraudulent inducement, arguing in essence that they were duped into doing business with Brown and BBL by Brown's false representation that he was a licensed physician.[4]

"In a Kentucky action for fraud, the party claiming harm must establish six elements of fraud by clear and convincing evidence as follows: a) material representation b) which is false c) known to be false or made recklessly d) made with inducement to be acted upon e) acted in reliance thereon and f) causing injury." *UPS v. Rickert*, 996 S.W.2d 464, 468 (Ky. 1999) (*citing Wahba v. Don Corlett Motors, Inc.*, 573 S.W.2d 357, 359 (Ky. Ct. App. 1978)). Defendants BBL and Brown attack the last element of the case. Federal Rule 9(b) sets a heightened pleading standard for claims of fraud, and requires a complaining party to plead with particularity (*inter alia*) "the injury resulting from the fraud." *Yuhasz v. Brush Wellman, Inc.*, 341 F.3d 559, 563 (6th Cir. 2003) (*quoting Coffey v. Foamex L.P.*, 2 F.3d 157, 161-62 (6th Cir. 1993)). Furthermore, "a plaintiff's obligation to provide the grounds of his entitle[ment] to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly* 550 U.S. at 555, 127 S.Ct. at 1964-65 (internal quotation marks omitted). On defendants' view, plaintiffs have insufficiently alleged injury resulting from Brown's misrepresentation.

Defendants have a point. The Amended Complaint contains two paragraphs purporting to allege injuries resulting from the fraud in question. First, they seek recovery of "all profits they would have made had Defendants not breached the Agreement through the inability to provide a licensed physician for promotional activity in Japan and/or [their] failure to provide adequate notice

---

[4] Plaintiffs admit that they have no fraud claim against Gurwitch. Therefore to the extent Count IV of the Amended complaint might be read to state such a claim, it will be dismissed.

of termination." (Am. Compl. ¶ 105.) Superficially, this looks like a claim for breach of contract, the damages for which are recoverable, if at all, in a separate breach action. (Indeed, a breach claim for failure to provide a licensed physician survives as part of Count I.) For purposes of the fraud claim, however, this statement must be read as a claim that the plaintiffs are entitled to damages in tort because the alleged contracts would not have been breached but for defendants' fraud. But the only reason the contracts would not have been breached is that they would not have been formed. (*See* Am. Compl. ¶ 104.) It is for that reason that the usual remedy for fraud in the inducement is rescission of the contract. *See* 1 Farnsworth on Contracts § 4.15 (2d Ed. 1998). Plaintiffs cannot be heard to argue that they would not have entered into a contract had it not been for the defendants' fraud, but that they should recover damages under that contract as a remedy for the fraud. To warrant a damages award, they must allege some form of injury external to the breach of the very contracts they say were fraudulently induced. *See, e.g.*, *Rickert*, 996 S.W.2d at 469 (affirming an award of damages representing wages lost in foregoing an employment opportunity based on fraudulent promises by an employee of the defendant company). Stated another way, the subsequent alleged breaches, and not Brown's misrepresentations, were the legal causes of the injuries plaintiffs claim in ¶ 105 of the Amended Complaint.

The second category of damages reads as follows: "As a result of Defendant Brown's fraudulent misrepresentation, TWB and Kalologie have suffered monetary damages which they are entitled to recover. Furthermore, . . . TWB and Kalologie are entitled to recover punitive damages." (Am. Compl. ¶ 106.) This allegation contains no particularity whatsoever. To say that a person "suffered monetary damages" is a conclusion, not a fact. Plaintiffs are obligated to provide "more than labels and conclusions." *Twombly* 550 U.S. at 555, 127 S.Ct. at 1964-65. They have failed to

do so. Having thus alleged no cognizable injury, plaintiffs are not entitled to recover for fraud. Accordingly, their claims will be dismissed.

\* \* \*

The Court will enter a separate Order consistent with this opinion.

                                              **Charles R. Simpson III, Judge**
                                              **United States District Court**